No. 752.

R. B. BURNS VS. A. H. VAN LOAN ET AL. AND J. L. HARGROVE VS. RUFUS
STANLEY ET AL. CONSOLIDATED.

The sale of the property of an absentee, who owes no debts, and is living at the
time, made by one who has obtained its administration, under an order of court,
without any proof having been made that the absentee was dead, or had been
absent for ten years and not heard from, is null and void.

A sale made by an order of court without authority to give the order, is utterly void
and prescription will not run in its favor.

APPEAL from the Tenth Judicial District Court, parish of Caddo.
*Looney*, J.

*J. L. Hargrove* and *Hicks & Hicks*, for plaintiffs and appellees.

*W. D. Wylie, C. C. Henderson, Looney & Elstner, W. N. Wise*, and *L.
M. Nutt*, for defendants.

The opinion of the court was delivered by

MANNING, C. J. In 1833 Patrick S. Ivers entered the land in contro-
versy at the United States Land Office in Natchitoches, and paid part of
the price. The land is in Caddo parish. Ivers was a strolling peddler. It
does not appear where he lived at that time, if, indeed, he had any fixed
habitation in this State. He had disappeared many years, when, in 1858,
T. P. Hotchkiss applied to the court of Caddo parish to be appointed
administrator of his succession, alleging that Ivers had "departed this
life many years ago, leaving in this parish a small amount of property
which is necessary to be administered."

On the nineteenth of July, 1858, evidence was taken on this application
for administration, and there was offered—

First—The publication of the notice of the application.

Second—Oral proof that the newspaper in which the notice appeared is
published in Shreveport.

No other testimony was offered or required. It is singular that when
such particularity was observed in proving what would have been as
well proved by filing copies of the newspaper, no one thought of proving
that Ivers was dead.

Hotchkiss was appointed administrator, qualified, and petitioned the
court for a sale of the land belonging to the succession. That was the
sole property, and the petition alleged that "there are debts due from
the succession, and it is necessary to sell the land to pay them." An
order of sale was thereupon entered, dated September 11, 1858. It was
not until three days afterward, on the fourteenth, that the attorney of
absent heirs "accepted service of the petition, and waived time and cita-
tion." The sale took place, the administrator made title to the purchaser,
and the defendants claim under that title through mesne conveyances.

While these proceedings were going on in Caddo parish, Ivers was living

with his family in Mississippi. A witness who had known him from boyhood, and during forty years, saw him near Monticello, in that State, in 1864. He died there in 1869. He had never completed the payment for the land to the Government, but his children did after his death, and a patent issued on the nineteenth of November, 1874, to Patrick S. Ivers, reciting that from the certificate of the register of the land-office at Natchitoches it appeared that full payment had been made for the land. The plaintiffs derive title from the heirs of Ivers under this patent.

The defendants contend that Ivers's long absence from the State created the presumption of death, and therefore his succession was properly opened, and the sale made under the order of the court is valid. They plead ownership and possession under this title, and the prescription of ten and twenty years.

When a person possessed of property within this State shall be absent, or shall reside elsewhere, and shall not have appointed somebody to take care of his property, the judge shall appoint a curator to administer it. This curator has no other power than that of administering the property, and has not the right to alienate or mortgage it under any pretense whatsoever. His responsibility is the same as that of a tutor; the mortgage by which tutors are bound attaches to him, and he has the same annual compensation. Whenever the curator shall apply to the court by petition, setting forth under oath that the absentee has not been heard from for ten years, and that he has no heirs, known to the curator, residing in the State; or if the judge knows these facts, or any other person than the curator shall make proof of them to the satisfaction of the judge, then it is his duty to order the sale of the property of the absentee and the payment of the funds arising from the sale into the State treasury. The curator of the absentee may file annual accounts of his administration, and have them homologated contradictorily with a curator *ad hoc* appointed for that purpose, and, when his administration ends, he must give an account of it. Civil Code, articles 50, 53, 56 (new Nos. 47, 50, 55; interpolated articles 53–4 in the revisal of 1870).

All of these provisions are contained in the Code of 1825, save that relative to the sale of the property, which became law in 1855 (Revised Statutes of 1856, p. 1), and which is incorporated in the revisal of the Code of 1870. None of them have been complied with. Instead of appointing a curator to administer the property, *i. e.*, to take care of it, to conserve it (for the word is manifestly not used here in its technical sense), who should render annual accounts of his gestion, and, when ten years have passed and the absentee has not been heard from, should apply to the court for a sale of his property upon a statement under oath of such absence, there was appointed an administrator, without proof either of death or ten years absence, or of any absence at all, who proceeded immediately to sell.

36

There is not intended here any finely-drawn distinctions between the two designations of the officer who is charged with the estate of the absentee. The defect of the proceeding does not consist in the nomenclature adopted. Whether he was denominated curator or administrator matters not, but the validity of his acts as the representative of the law, who had control of the property of the absentee, must be tested by the law. The Code of 1825 gave him no power either to alienate or mortgage the property. It expressly withheld that power from him. It contemplated a long administration of it, as a tutor has of a minor's oftentimes, and permitted him to file annual accounts. It was only terminated when the absentee appointed an attorney in fact for the administration of his estate, or, when a certain time having passed without hearing of him, his heirs caused themselves to be put provisionally in possession of it. Civil Code, article 55 (new No. 52). The Legislature of 1855 provided a new mode of terminating this administration of an absentee's property. If the absence shall have continued ten years, a sale may be effected in the manner and under the circumstances detailed in the act of that year.

But in this case there was no curator who had been burthened for ten years with administering the property of an absent owner, and who desired to avail himself of this legislative permission to sell and pay the proceeds to the fisc. Nor was the treasury much benefited, since the payment was made August 1, 1863, when the only currency of that locality was greatly depreciated. If there had been creditors, the case would have been wholly different. But Ivers owed nobody. The debts which the property was sold to pay were all created by the proceedings for selling it. If Ivers was alive, and any one was desirous of benefiting him, he could apply for the curatorship, and administer his property, taking care of it and conserving it. If he was dead, his heirs owned the property, and it was their concern to protect their interests. The sole object of the administration was to sell. The meagre account shows that nobody was paid any thing, and nobody claimed any thing, except the clerk, and sheriff, and attorney, and printer, and administrator. Three hundred and seventy-four dollars were paid into the treasury.

If Ivers had been dead at that moment, all this would have been wrong. Our law does not contemplate an administration of a succession, if there are no debts. Its settlement is otherwise provided for. Therefore, if Ivers had been away long enough to create the presumption of death, and it was lawful to settle his succession as if he were dead, this mode of settlement is unlawful. One can not raise an illegal presumption of death, and, acting upon it, dispose of the property in a manner which would be illegal if the owner were dead. There was no proof whatever of prolonged absence, in order to create the presumption of

death, nor proof of actual death. And if the succession sale of Ivers's property, upon which the defendants rest as the source of their title, is illegal, because not conducted under the forms for alienating a decedent's property, nor under the forms for alienating an absentee's property, much more is it invalid when made during the life of its owner, and when no necessity for the alienation existed. The title of Hotchkiss as administrator is null, because he had no authority to make it, and the prescription pleaded does not validate it. It was not a sale the informalities of which are cured by a certain lapse of time, and which becomes perfect through prescription, but it was void because the court was without authority to order it. Morton vs. Reynolds, 4 Rob. 26; McCluskey vs. Webb, idem, 201; Robert vs. Brown, 14 Annual, 598.

A. H. Van Loan, one of the defendants, had entered a part of this land by permission of the register of the land-office at Natchitoches, and other parties had effected entries before his was made. This elicited the following letter of instructions from the Commissioner of the General Land-Office at Washington to the register at Natchitoches. It is dated April 1, 1873:

"On the first of October, 1872, you were advised of the cancellation of homestead entry No. 748, Abraham H. Van Loan, upon the (here follows description by sections, range, etc.), for conflict with the prior cash entry of Patrick Stanbury Ivers, No. 998, dated January 27, 1833, for the northwest quarter of said section, and that the above was the third entry allowed upon said tract, contrary to express instructions contained in the above letter. You have allowed Mr. Van Loan to commute his entry to cash, under the eighth section of the act of May 20, 1862. You will please advise Mr. Van Loan of the cancellation of his commutation entry, and that the purchase money paid thereon will be refunded upon proper application being made through you to this office."

It is urged on the part of the defendants that the decree of the court ordering the sale of the succession property should protect them, and, as the court which thus ordered the sale had jurisdiction of successions, it was not for them to look beyond it. But that is assuming as true that which we know was not true. The owner was not dead. There was no succession. Chief Justice Marshall thus disposes of that position:

"To give the ordinary jurisdiction, a case in which, by law, letters of administration may issue must be brought before him. In the common case of intestacy it is clear that letters of administration must be granted to some person by the ordinary, and, though they should be granted to one not entitled by law, still the act is binding until annulled by the competent authority, because he had power to grant letters of administration in the case. But suppose administration to be granted on the estate of a person not really dead. The act, all will admit, is totally void. The

ordinary must always inquire and decide whether the person whose estate is to be committed to the care of others be dead or in life." Griffith vs. Frazier, 8 Cranch. 9.

And it can not with reason be contended that the defendants were prudent, or not careless, in purchasing under a title which had on its face so many features to warn against approach. The proceedings in the succession should have put every inquirer on his guard.

The judgments of the lower court in both cases were for the plaintiffs, and they are affirmed.